**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LOU CHRISTOPHER, JORDAN BRAINARD, AND ASHER INMAN <br><br> PLAINTIFFS, <br> v. <br><br> CBRE, INC. AND PETER SCHIPPITS, <br><br> Defendants. | Case No. _____ |

Plaintiffs Lou Christopher ("Mr. Christopher"), Jordan Brainard ("Ms. Brainard"), and Asher Inman ("Mr. Inman") (collectively, "Plaintiffs" or the "D.C. team"), by and through counsel, bring this suit against Defendants CBRE, Inc. ("CBRE") and Peter Schippits ("Mr. Schippits"). In support thereof, Plaintiffs state as follows:

## <u>SUMMARY OF CLAIMS</u>

Lou Christopher, Jordan Brainard, and Asher Inman built their reputations at CBRE by doing exactly the kind of work the company says it values most: winning difficult assignments, leading complex deals, and delivering client favorable results in the D.C. market. With CBRE's knowledge and pre-approval, they originated and executed one of the most significant and lucrative tenant-representation transactions in D.C. in 2025—among the largest in the history of CBRE's D.C. office.

Unfortunately, once the work was complete and the money was in hand, CBRE breached the Plaintiffs' contracts, disregarded its own written policies, and diverted half of the resulting commission to brokers who did not originate or perform the work. When Plaintiffs pushed back and asked to be paid all the wages they earned under their contracts, D.C. law, and CBRE's policies, the company retaliated by withholding even undisputed wages, inventing conditions for payment, and refusing to explain why it withheld millions of dollars in earned compensation.

This case is about whether a company can claim to reward top performers and make employees feel heard and valued while rewriting the rules and retaliating after the work is done, the money is in hand, and its employees ask to be paid what they earned.

**NATURE OF THE ACTION**

1. This is an earned-wages dispute. Plaintiffs originated and executed a significant Washington, D.C. office lease transaction for a legal industry company with a global footprint and a substantial D.C. presence (respectively, the "Legal Industry Client" and the "D.C. Office Transaction"), yet CBRE misallocated a substantial portion of the resulting commission wages and related production-based compensation to brokers who did not win or perform the work.

2. In December 2023, the Legal Industry Client's Managing Partner (the "D.C. Office Managing Partner") selected Mr. Christopher and Ms. Brainard—and, through them, Mr. Inman— to lead the assignment. The D.C. Office Managing Partner was the sole decisionmaker for broker selection for the Legal Industry Client's D.C. office and it was Plaintiffs' relationship with that decisionmaker that secured the work for CBRE.

3. Over the next two years, Plaintiffs performed all the day-to-day work necessary to complete the transaction, including strategy, tours, RFPs, negotiations, financial analyses, and bespoke lease negotiations. When the deal closed, CBRE received several million dollars in commission-eligible proceeds.

4. After the work was done and the money was in hand, Mr. Schippits issued a directive diverting the D.C. Office Transaction commission to two brokers who did not secure the revenue opportunity or perform the work that generated the commission, Todd Lippman and Joe Cabrera (collectively, the "Non-Originating Brokers"). Mr. Schippits is the President of CBRE's East Region and managed Mr. Lippman, Mr. Cabrera, and the Plaintiffs. He reports directly to Mr. Lippman's friend and former direct manager, CBRE President Christopher Connelly.

5. Mr. Schippits was the allegedly "neutral" decisionmaker selected by CBRE to allocate the D.C. Office Transaction commission when Mr. Lippman and Mr. Cabrera sought the

majority of the earnings despite having done no work to secure or execute the D.C. Office Transaction. Mr. Schippits ultimately awarded 50 percent of the Plaintiffs' commission wages to Mr. Lippman and Mr. Cabrera without explanation.

6. Mr. Schippits' decision directly conflicts with CBRE's obligation to follow its own policies and pay commission wages based on a broker's relative contributions to a transaction.

7. Mr. Schippits handed down his decision after Plaintiffs asserted their legal rights to their earned wages. But his decision was only one of a number of retaliatory acts taken by CBRE in response to Plaintiffs' request for the wages they had earned. Among other things, CBRE withheld undisputed commission wages, invented pretextual and unwritten hoops for Plaintiffs to jump through to receive conceded wages, excluded Mr. Inman from the internal dispute-resolution process that determined his compensation, and engaged in a pattern of delay and pressure with other conceded wages instead of paying the wages when they were due.

8. This action seeks unpaid wages and bonuses under the District of Columbia's Wage Payment and Collection Law ("WPCL") and judicial relief for CBRE's breach of contract, retaliation against Plaintiffs, and intentional infliction of emotional distress.

## **PARTIES**

9. Plaintiff Lou Christopher is an individual who resides in and is a citizen of Florida. Mr. Christopher worked for CBRE from January 2012 until February 9, 2026. He last held the title of Vice Chairman and worked from CBRE's Washington, D.C. office.

10. Plaintiff Jordan Brainard is an individual who resides in and is a citizen of Maryland. Ms. Brainard worked for CBRE from February 2012 until February 9, 2026. She last held the title of Executive Vice President and worked from CBRE's Washington, D.C. office.

11. Plaintiff Asher Inman is an individual who resides in and is a citizen of Washington, D.C. Mr. Inman worked for CBRE from September 2021 until February 9, 2026. He last held the

3

title of Senior Associate and worked at CBRE's Washington, D.C. office. His compensation consisted solely of commission wages and his share in team-generated transactions.

12.     Plaintiffs enjoyed distinguished careers as one of CBRE's premier broker teams. They led some of the most significant real estate assignments in the D.C. market on behalf of Fortune 500 companies, large law firms, and other leading enterprises. Mr. Christopher and Ms. Brainard were consistently recognized as leaders and top-performing brokers within CBRE and in the D.C. market. Their team had earned such trust and respect that when CBRE needed to negotiate its own D.C. office lease, it tapped Mr. Christopher and Ms. Brainard as the brokers to lead and negotiate the transaction. About that transaction, CBRE's former head of the Mid-Atlantic region commented that Mr. Christopher was "transformational" and prioritized the CBRE "brand" over his own personal advancement.[1]

13.     Defendant CBRE, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas. CBRE operates a substantial commercial real estate brokerage business in the District of Columbia, including the Washington, D.C. office from which Plaintiffs originated and executed the D.C. Office Transaction.

14.     Defendant Peter Schippits is, on information and belief, an individual who resides in and is a citizen of Colorado. At all relevant times, he served as CBRE's Group President, East Region, acted as the designated decisionmaker under CBRE Policy 10.11, and, on information and belief, directed, ratified, or participated in the withholding and delayed payment of conceded wages after Plaintiffs asserted their wage rights.

## JURISDICTION, VENUE, AND NON-ARBITRABILITY

---

[1] M.J. McAteer, The "Senior" Guy, Va. Bus. (July 28, 2015), https://virginiabusiness.com/the-senior-guy/.

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs, as to each Plaintiff. Plaintiffs are citizens of Florida, Maryland, and the District of Columbia; CBRE is a citizen of Delaware and Texas; and, on information and belief, Mr. Schippits is a citizen of Colorado.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in the District of Columbia. Plaintiffs originated, managed, and executed the D.C. Office Transaction from CBRE's office at 1900 N Street NW, Suite 700, Washington, D.C. 20036.

17.     Plaintiffs' claims are not subject to mandatory arbitration. CBRE's employment agreements and incorporated policies separately address disputes between sales professionals over commission distribution through paragraph 11 and CBRE Policy 10.11, which sets out an internal dispute-resolution process for inter-broker commission disputes, and CBRE invoked that internal process here to decide the inter-broker fee split in the first instance.

18.     This action, by contrast, seeks judicial relief against CBRE for its own conduct after that internal process: breaching the parties' employment agreements, withholding disputed wages and related production-based compensation, retaliating after Plaintiffs asserted wage rights, and engaging in extreme and outrageous conduct. CBRE cannot use a non-neutral internal business process to extinguish Plaintiffs' statutory wage rights or foreclose judicial relief on their contract, tort, and retaliation claims.

19.     At minimum, any contrary construction would operate as an unlawful waiver of nonwaivable wage rights. *See Raggio v. CBRE, Inc.*, No. CV 21-03237 PA (JPRx), 2021 WL 4706704, at *2–4 (C.D. Cal. July 16, 2021) (rejecting CBRE's argument that substantially identical

contract and policy language barred court litigation of wage claims following CBRE's internal commission process).

20.     An actual controversy therefore exists concerning whether CBRE's internal process or any asserted arbitration provision bars this action, and Plaintiffs seek declaratory relief on that issue below.

## STATEMENT OF FACTS

I.    **CBRE Employed Plaintiffs Pursuant to Written Agreements That Incorporated CBRE's Policies**

21.     On January 27, 2012, CBRE and Mr. Christopher executed a Broker-Salesperson Contract, an Indemnity Agreement, and later addenda governing his compensation and other terms of employment. Mr. Christopher's agreements incorporate CBRE's policies by reference and require commissions to be paid in accordance with those policies.

22.     On January 14, 2020, CBRE and Ms. Brainard executed a Broker-Salesperson Contract which, together with her First Addendum and Indemnity Agreement, collectively form her Employment Agreements. Those documents incorporate CBRE's policies and require commissions to be paid in accordance with them.

23.     On April 21, 2021, CBRE hired Mr. Inman as a Senior Associate, effective September 13, 2021. His offer letter/First Addendum, Second Addendum, Broker-Salesperson Contract, and Indemnity Agreement collectively govern his employment with CBRE. Those documents also incorporate CBRE's policies and require commissions to be paid in accordance with them.

24.     CBRE Policy 10.12 provides that a professional commission is earned in the month and year in which the Company is paid and receives the Gross Commission, subject to the policy's general provisions, and that the Company shall pay Professional Commissions "as soon as

6

reasonably possible after receipt thereof by the Company." Consistent with that policy and CBRE's regular payroll practice, once an undisputed commission or undisputed portion of a commission is earned and received, CBRE pays it on the next regular payroll absent a policy-based contingency applicable only to the disputed portion.

25.    CBRE Policy 10.04.01 governs internal fee sharing and states that compensation should be directly related to and based upon the relative contributions of the Originating Party and the Receiving Party. The policy defines the "Originating Party" as the professional responsible for introducing an engagement and the "Receiving Party" as the professional or profit center introduced to the engagement by the Originating Party. Plaintiffs were both the Originating Party and the Receiving Party for the D.C. Office Transaction.

26.    CBRE also maintains a "Single Point of Contact" protocol, commonly referred to internally as the "SPOC" protocol. Under that protocol, a designated broker is supposed to serve as the internal coordination point for a client relationship. The protocol is a coordination tool for potential clients' benefit, not a free-floating commission entitlement. It states that SPOC designations should apply only where CBRE is engaged in doing work or making demonstrable progress developing a relationship, and it requires ongoing review, an expiration date, and deactivation when progress is lacking.

27.    The SPOC protocol permits a SPOC designation only in limited circumstances, requires approval by appropriate regional or line-of-business leadership, mandates an expiration date no later than one year or a critical sales event, requires semiannual and annual reviews, and directs managers to aggressively deactivate SPOCs when there is no documented forward progress. It further provides that the SPOC list should not inhibit new business development.

28. Separate from the companywide SPOC protocol, CBRE adopted Mid-Atlantic Occupier Business Operating Protocols (the "OBOP") to govern how Mid-Atlantic professionals should proceed when a company appears on the SPOC list, but CBRE may not control the business locally. The OBOP directs professionals to raise potential issues with a SPOC designation with leadership before pursuing a local opportunity to obtain direction on how best to proceed. Leadership's determination then governs how and whether Mid-Atlantic professionals may pursue the local opportunity irrespective of an apparently contrary SPOC designation. When the opportunity is reported immediately and cleared appropriately, the OBOP imposes no continuing requirement that the professionals repeatedly re-seek approval as the opportunity develops.

29. CBRE also publicly represents that its business and workplace culture are guided by its "RISE" values—Respect, Integrity, Service, and Excellence. CBRE states that those values "underpin everything" it does; that it maintains a culture of excellence that rewards top performance; that it fosters an environment in which its people are heard, valued, and supported; and that it insists on a workplace in which everyone is treated fairly and with respect. Those public statements are consistent with, and reinforce, the contractual and policy-based expectation that CBRE will administer compensation, internal processes, and workplace treatment in a fair, professional, and good-faith manner.

## II. Plaintiffs Originated and Executed the D.C. Office Transaction

30. Plaintiffs were both the Originating Party and, under CBRE's policies, the Receiving Party on the D.C. Office Transaction. Plaintiffs originated the D.C. Office Transaction through Mr. Christopher's and Ms. Brainard's independent relationship with the Legal Industry Client's D.C. Office Managing Partner. Like many large legal industry companies, the Legal Industry Client delegates major office-level real-estate decisions to the managing partners of its significant offices. The D.C. Office Managing Partner is a member of the Legal Industry Client's eight-person

management committee and was the sole decisionmaker for the D.C. office's broker selection on this engagement. To illustrate the point, the agreement to execute the lease required input from other members of the Legal Industry Client's management committee, but the D.C. Office Managing Partner knew that she did not need to obtain consent from the other members of the Legal Industry Client's management committee to engage a broker for the D.C. office requirement.  She exercised her discretion to contact and ultimately engage the Plaintiffs because of the relationship she developed with them.

31.    Mr. Christopher met the D.C. Office Managing Partner in early 2023, and he and Ms. Brainard thereafter built trust with her through substantive market advice, presentations, and engagement-specific support. No one else at CBRE was focused on the Legal Industry Client's D.C. office lease because it did not expire until 2031, but unanticipated tenant movement in the Legal Industry Client's D.C. office building created an unexpected opportunity that caused the D.C. Office Managing Partner to begin actively meeting with multiple brokers concerning the lease opportunity after declining to move forward with the Legal Industry Client's existing D.C. broker.

32.    Ultimately, Plaintiffs' local relationship—not any relationship possessed by the Non-Originating Brokers—led the D.C. Office Managing Partner to select the Plaintiffs as the broker team to negotiate The Legal Industry Client's D.C. office lease.

33.    It was understood both by the Legal Industry Client and by CBRE that the D.C. Office Managing Partner possessed sole authority to select a broker team for the D.C. Office Transaction. The Legal Industry Client's Director of Administration, the Legal Industry Client's Chief Operating Officer, and a separate CBRE broker who handled California work for the Legal Industry Client each confirmed, in substance, that the Legal Industry Client's major office real-estate decisions are fragmented and driven by local managing partners rather than by a single national gatekeeper.

9

34.     Because the Legal Industry Client appeared on CBRE's SPOC list, Plaintiffs did exactly what the OBOP required: they raised the issue with Mid-Atlantic leadership before moving forward with the local opportunity. CBRE's Mid-Atlantic leaders evaluated whether the SPOC listing actually meant that CBRE controlled the Legal Industry Client's D.C. business locally, concluded that it did not, recognized that there was a real local revenue opportunity in play, and authorized Plaintiffs to proceed. In doing so, leadership considered, among other things, that the Legal Industry Client's decision-making is fragmented and major-office decisions are driven by local managing partners; that the D.C. Office Managing Partner had sole discretion over broker selection for the transaction; that Mr. Lippman's team had pitched and lost the Legal Industry Client's prior D.C. representation because his contact at the Legal Industry Client did not control D.C. office decisions; and that CBRE had likewise lost opportunities for the Legal Industry Client in other markets because local relationships, not a purported global SPOC, controlled those engagements.

35.     That leadership approval came from the very officials the OBOP contemplates should make that call, Plaintiffs' direct supervisors: Jamie Georgas, CBRE's Executive Managing Director and Occupier Leader for the Mid-Atlantic Region, and Kyle Schoppmann, CBRE's President for the Mid-Atlantic Region. Plaintiffs reasonably relied on the informed approval they received from their managers, office leaders, and region leaders. If CBRE producers cannot reasonably rely on clearance given by the Mid-Atlantic Occupier Leader, the Mid-Atlantic President, and their direct managers after elevating a SPOC issue exactly as the OBOP requires, then the protocol does not function as a meaningful policy.

36.     Plaintiffs continued to keep Mid-Atlantic leadership apprised as the opportunity developed, and Ms. Schoppmann and Ms. Georgas remained involved as the opportunity progressed,

10

including participating in the initial presentation by the Plaintiffs to the  D.C. Office Managing Partner, CBRE's preparation of and the Legal Industry Client's execution of a non-disclosure agreement that effectively served as the initial engagement agreement between the Legal Industry Client and CBRE ("NDA"), and providing the necessary leadership approvals for Plaintiffs to proceed. CBRE thus not only knew Plaintiffs were advancing the D.C. Office opportunity for the Legal Industry Client notwithstanding the legacy SPOC listing; it affirmatively approved and ratified that course.

37.    On October 25, 2023, the Legal Industry Client's D.C.'s administrator requested an NDA. Plaintiffs worked through CBRE leadership and CBRE legal to obtain and execute the NDA, and on December 5, 2023, the D.C. Office Managing Partner informed Plaintiffs that the Legal Industry Client's  D.C. office was hiring them for the assignment.

38.    After the Legal Industry Client's chief operating officer ("COO") in Chicago learned that the D.C. Office Managing Partner had exercised her authority and engaged the Plaintiffs, the D.C. Office Managing Partner asked Mr. Christopher if he would mind keeping Mr. Lippman informed about the progress of the transaction because Mr. Lippman had a relationship with the Legal Industry Client's COO. CBRE leadership subsequently approved a structure under which Plaintiffs would lead and execute the engagement while Mr. Lippman would be kept apprised of key milestones.

39.    Plaintiffs, as both the Originating Party and the Receiving Party under CBRE's policy framework, then performed all the work that produced the commission. Over nearly two years, they maintained and managed the relationship with the D.C. Office Managing Partner and the Legal Industry Client's local administrator; designed and executed an initial renewal strategy over an extended period; pivoted to a new-construction solution under severe time pressure after prior

11

negotiations fell through; navigated landlord distress, note sales, foreclosure dynamics, recapitalization, and zoning concerns; handled the negotiation of heavily bespoke lease provisions tailored to the Legal Industry Client's global and D.C.-specific requirements; managed the day-to-day transaction process, including tours, requests for proposals, financial analyses, counterproposals, and coordination with the Legal Industry Client's internal and external advisors; and leveraged their relationship with BXP to ensure CBRE received the commission upon full execution of the lease.

40.    In light of the level of complexity and service related to the D.C. Office Transaction, Plaintiffs also negotiated rebate terms that increased the net fee CBRE received for the D.C. Office Transaction. Had the transaction proceeded on the legacy commercial terms associated with the Non-Originating Brokers' prior relationship, the Legal Industry Client would have received a significantly larger rebate than the Plaintiffs were able to negotiate based on their relationship, which resulted in CBRE receiving approximately $2 million more in net fees than would have been realized if the Non-Originating Brokers had actually originated or led the transaction. In short, CBRE authorized Plaintiffs' work, accepted the benefits of their work, pocketed the added revenue that Plaintiffs' creativity and hard work generated, and then retroactively claimed a SPOC violation had occurred, denying the Plaintiffs the compensation due under their contracts.

41.    Mr. Cabrera did not work on the D.C. Office Transaction at all. Mr. Lippman's involvement was limited to narrow, late-stage review assistance and helping the Legal Industry Client's COO become comfortable with the proposed transaction terms. Neither Non-Originating Broker originated the Legal Industry Client D.C. mandate, performed the substantive work that produced the fee, or spoke with the D.C. Office Managing Partner or BXP during the lease negotiation or the extensive search process that preceded it.

42. The Non-Originating Brokers were not meaningfully involved in the engagement. Plaintiffs provided updates and offered calls, but Mr. Lippman and the Legal Industry Client COO did not respond and remained disengaged for extended periods. The D.C. Office Managing Partner ultimately instructed Plaintiffs that there was no reason to continue providing updates unless specifically requested, and Plaintiffs complied with that client direction.

43. The D.C. Office Transaction closed on October 30, 2025, and CBRE received the commission proceeds on November 18, 2025. Under the governing contracts and policies, Plaintiffs were entitled to the overwhelming majority, if not all, of the resulting commission wages and related production-based compensation.

## III. CBRE Misallocated the D.C. Office Transaction commission Through a Defective Internal Process

44. Despite Plaintiffs' origination and execution of the work, and the Non-Originating Brokers' failure to propose a timely, policy-consistent commission allocation or to meaningfully participate in the execution of the D.C. Office Transaction, the Non-Originating Brokers demanded a substantial share of the D.C. Office Transaction commission based on a legacy SPOC designation. That demand was made notwithstanding the fact that CBRE Mid-Atlantic leadership had already evaluated the SPOC issue, determined that Plaintiffs could proceed without violating the protocol, and expressly authorized them to proceed, which they did for nearly two years.

45. On November 11, 2025, Mr. Lippman and Mr. Cabrera wrote that, if the SPOC protocol had been followed, the fee would be split 60 percent to Chicago/New York and 40 percent to D.C., and they offered to "avoid going to [CBRE's internal] arbitration" by accepting a 50/50 split. That communication acknowledged, at minimum, that 40% of the fee indisputably belonged to the D.C. team. On information and belief, CBRE's leadership knew long before November 11,

13

2025, that the Non-Originating Brokers conceded that, at a minimum, the Plaintiffs would be entitled to 40% of the D.C. Office Transaction commission pool.

46.    On October 14, 2025, the Plaintiffs presented the Non-Originating Brokers with a fair offer that appropriately valued Mr. Lippman's minimal review contribution, in light of the more than two years of transaction-specific work the Plaintiffs undertook only after CBRE's Mid-Atlantic leaders concluded there was no SPOC designation issue and authorized them to proceed. Mr. Lippman and Mr. Cabrera did not meaningfully respond or counter for weeks.

47.    Effectively, the Non-Originating Brokers did not pursue a timely, policy-consistent allocation while Plaintiffs performed the work that created the revenue at issue and instead waited until the work was fully complete before attempting to leverage a legacy SPOC designation and into a fee allocation disproportionate to their actual contribution.

48.    The Non-Originating Brokers' SPOC designation related to the Legal Industry Client had not been actively policed in accordance with the Legal Industry Client's requirements and had been allowed to persist even though significant matters for the Legal Industry Client in California were handled by other CBRE brokers without fee sharing with the Non-Originating Brokers. Furthermore, the Legal Industry Client routinely retained competing firms to handle their major-office and major-market leasing needs because the Legal Industry Client's largest office decisions were made by local leaders with whom the Non-Originating Brokers did not have the necessary relationships.

49.    Had CBRE followed its own SPOC governance rules, the Non-Originating Brokers would not have been positioned to claim a windfall from work they neither originated nor performed. Thus, in entertaining Mr. Lippman and Mr. Cabrera's claims, CBRE refused to apply its own written policies faithfully. Instead, it treated the dispute as though a legacy SPOC designation could override

CBRE's own relative-contributions standard, notwithstanding the fact that the SPOC protocol itself requires active policing, requalification, expiration, and deactivation where there is no documented forward progress; the Mid-Atlantic leadership team had already authorized Plaintiffs to proceed with the Legal Industry Client's D.C. office opportunity after determining that there was not a SPOC designation issue; and CBRE had accepted the benefits of Plaintiffs' performance for nearly two years.

50.     CBRE received the D.C. Office Transaction commission on November 18, 2025, and pursuant to CBRE's regular payroll practice and internal policies, CBRE should have paid Plaintiffs' undisputed 40 percent share of that commission on November 28, 2025. CBRE did not do so.

51.     Having received no confirmation that undisputed funds would be released, Plaintiffs promptly objected and sought release of the undisputed portion of the fee. On November 24, 2025, Mr. Christopher and Ms. Brainard wrote to CBRE that Policy 10.11 expressly provides that "the portion of the commission that is not subject to the Dispute shall not be held in suspense and may be distributed," and they expressly warned that they would pursue legal remedies if CBRE failed to release the undisputed funds by the next regularly scheduled payroll. Under Policy 10.12 and CBRE's regular payroll practice, the undisputed portion of a commission earned in a pay period and received by the Company is paid on the next regular payroll.

52.     On November 25, 2025, Kyle Schoppmann responded that no amount would be treated as undisputed unless all sales professionals and all first-line managers agreed in writing through an email thread. That extra-textual prerequisite appears nowhere in Policy 10.11 or any employment agreement.  Even if such a prerequisite existed, all sales professionals had agreed in writing that Plaintiffs were entitled to at least  40 percent of the D.C. Office Transaction commission in an email copied to the relevant managers.  Thus, under Policy 10.11's no-suspense requirement,

15

Policy 10.12's prompt-payment requirement, and CBRE's regular payroll practice, once CBRE received the D.C. Office Transaction commission on November 18, 2025, the conceded 40 percent should have been paid on the next payroll, November 28, 2025.

53.    Around the same time, Plaintiffs learned that CBRE Mid-Atlantic leadership had become concerned that CBRE senior leadership in Chicago and NY had stopped communicating with CBRE Mid-Atlantic leadership about the issue, which was not typical based on how other/prior internal fee disputes progressed.

54.    On information and belief, Ms. Schoppmann issued the November 25, 2025, directive based on concerns raised by other CBRE leaders that it "wouldn't be fair" for Plaintiffs to receive the undisputed 40 percent of the D.C. Office Transaction fee while the Non-Originating Brokers could only receive  the amount that was not in dispute (because Plaintiffs offered it as a business accommodation)  pending resolution of the dispute the Non-Originating Brokers created through intentional and dilatory acts.

55.    CBRE continued to hold the conceded D.C. Office Transaction commission wages due to the Plaintiffs until December 12, 2025, fourteen days after the November 28, 2025, payroll on which those funds should have been paid. CBRE later repeated the same conduct with conceded commissions from another significant corporate client transaction (the "Additional Commission Wages Due") due on February 20, 2026, paying Mr. Christopher and Ms. Brainard on March 13, 2026, and Mr. Inman on March 16, 2026.[2]

---

[2] Plaintiffs are pursuing the narrow statutory late-payment claims tied to the conceded D.C. Office Transaction commission wages and the Additional Commission Wages Due separately before the District of Columbia Department of Employment Services and do not seek duplicative recovery for those amounts in this action.

56.    All the while, CBRE continued to push forward with an "internal dispute resolution" process to decide the allocation of the D.C. Office Transaction commission. It was clear from the outset that the resolution would be neither prompt nor reasonable.

57.    In November 2025, Ms. Georgas communicated to Plaintiffs, in substance, that Ms. Schoppmann "had amnesia" and was disclaiming or forgetting the approval previously given for Plaintiffs to proceed with the Legal Industry Client's D.C. office opportunity notwithstanding the legacy SPOC listing. On information and belief, Ms. Georgas and Ms. Schoppmann were pressured to retreat from the positions they had previously taken consistent with CBRE's policies and the approval they had previously given after evaluating the SPOC issue to undermine Plaintiffs' entitlement to their earned commission wages.

58.    On information and belief, before the internal dispute-resolution process had even begun, and before Plaintiffs had been heard, CBRE President Christopher Connelly spoke to Mr. Lippman about the issue and, based on that conversation, told Ms. Schoppmann "sounds like we have a SPOC violation." That sequence reflects that senior CBRE leadership had already adopted or ratified a predetermined view of the supposed SPOC issue before any neutral application of CBRE's relative-contributions policies or objective and unbiased determination of the appropriate allocation of the D.C. Office Transaction commission had occurred.

59.    On December 30, 2025, Peter Schippits, acting on behalf of CBRE and pursuant to the company's internal dispute framework, issued a brief internal decision awarding 50 percent of the post-client-rebate fee to the D.C. team and 50 percent to the Chicago/New York team. On information and belief, Mr. Schippits participated in, directed, or ratified CBRE's continued refusal to release conceded wages without extra-textual conditions and used the internal process to formalize a result that departed from CBRE's stated relative-contributions standard. The decision

17

did not meaningfully apply that standard and did not explain how an equal split could be reconciled with the actual record of origination and execution.

60.     On information and belief, after Plaintiffs invoked Policy 10.11's no-suspense language and threatened legal action, Mr. Schippits directed, ratified, or participated in CBRE's decision not to release the conceded D.C. Office Transaction commission amounts absent the extra-textual written approvals demanded by Schoppmann and to continue holding payment notwithstanding the policy's express command that the undisputed portion "shall not be held in suspense." On information and belief, Mr. Schippits also directed, ratified, or participated in CBRE's use of the December 30, 2025, internal decision as an adverse action to penalize Plaintiffs for asserting wage rights and to justify short-changing them on the disputed D.C. Office Transaction commission wages.

61.     CBRE then used that internal decision to justify withholding from Plaintiffs more than $4 million in disputed D.C. Office Transaction commission wages and related production-based compensation that should have been allocated to them under their contracts and CBRE's policies. On information and belief, that use of the internal decision—coming on the heels of Plaintiffs' wage complaints and threat of legal action—was itself retaliatory.

62.     Having instructed Plaintiffs to proceed under the OBOP, participated in the initial meeting led by the Plaintiffs, approved the NDA for submission to the Legal Industry Client, signed the NDA, accepted the benefits of Plaintiffs' performance for nearly two years, and received the resulting multimillion-dollar fee, CBRE is equitably estopped from invoking an asserted SPOC violation as a basis to divert half of the commission to brokers who neither originated nor executed the transaction.

18

**IV.    Plaintiffs Asserted Their Wage Rights and CBRE Retaliated**

63.    CBRE's conduct in connection with the D.C. Office Transaction was inconsistent not only with its written compensation, SPOC, and dispute-resolution policies, but also with the RISE values it publicly claims guide its culture. Rather than acting with respect, integrity, service, and excellence, CBRE approved Plaintiffs to pursue the opportunity, accepted the benefit of nearly two years of their work, received the resulting multimillion-dollar fee, and then used a non-neutral internal process, shifting requirements, and extra-textual payment conditions to divert compensation away from the brokers who actually originated and executed the engagement. In doing so, CBRE failed to reward the performance that generated the revenue at issue, failed to treat Plaintiffs fairly, and failed to conduct itself in the transparent and professional manner it publicly espouses.

64.    Plaintiffs engaged in protected activity by objecting to CBRE's withholding of wages that were conceded to be due, invoking Policy 10.11's express no-suspense language, and expressly warning that they would pursue legal remedies if CBRE failed to pay the undisputed portion of the D.C. Office Transaction commission.

65.    When Plaintiffs asserted their rights to the wages they had earned, CBRE intensified the adverse treatment rather than curing the problem. CBRE withheld conceded amounts, imposed extra-textual conditions on payment, excluded Mr. Inman from the internal process that determined his compensation, and, on information and belief, through Schippits, participated in, directed, or ratified both the December 30, 2025, internal decision and the untimely payment of conceded D.C. Office Transaction commissions and Additional Commission Wages Due as retaliatory measures after Plaintiffs asserted rights protected by District of Columbia wage law.

66.    On information and belief, Mr. Schippits knew before he issued the December 30, 2025, decision that Plaintiffs had complained about unpaid and untimely wages, invoked Policy 10.11's no-suspense language, and threatened legal action if CBRE failed to release the undisputed

portion of the D.C. Office Transaction commission. On information and belief, he thereafter directed, ratified, or participated both in (i) the retaliatory issuance of that decision, and CBRE's reliance on it to justify withholding disputed wages and related production-based compensation and (ii) CBRE's refusal to pay the undisputed D.C. Office Transaction commission wages on the next payroll and the delayed payment of conceded Additional Commission Wages due after Plaintiffs had asserted their statutory and contractual rights.

67.     The retaliatory measures taken by CBRE and, on information and belief, Mr. Schippits were coercive and intended to pressure Plaintiffs into abandoning their claim to the compensation they had earned on the D.C. Office Transaction and to punish them for asserting rights protected by the WPCL.

68.     That retaliatory course of conduct also departed sharply from CBRE's public commitment to a workplace in which employees are heard, valued, treated fairly, and supported in realizing their potential. Plaintiffs raised wage concerns through internal channels and invoked CBRE's own policies. Instead of responding with integrity or respect, CBRE and, on information and belief, Mr. Schippits participated in, directed, or ratified a course of conduct that included an adverse internal decision, continued withholding of conceded wages and untimely payment of amounts already acknowledged to be due. Those actions are inconsistent with the values-driven culture CBRE publicly claims to maintain.

69.     CBRE's actions caused severe financial harm and significant emotional distress. Plaintiffs lost sleep, experienced severe anxiety, suffered disrupted holidays and travel, and ultimately left CBRE because they no longer trusted the Company to pay them their earned wages.

## V.    Federal Court Is the Proper Forum

70.     Lou Christopher's 2012-form agreement excludes from arbitration disputes that CBRE is authorized to resolve under paragraph 11 or CBRE's policies, including Policy 10.11.

20

Jordan Brainard's and Asher Inman's 2016-form agreements likewise recognize in paragraph 11 that, except as provided by law or regulation, CBRE may settle disputes between sales professionals, and paragraph 18(H) preserves the filing of charges or participation in investigations before government agencies.

71.     CBRE invoked paragraph 11 and Policy 10.11 here and compelled Plaintiffs through its internal business process to resolve the inter-broker fee dispute in the first instance. Having done so, CBRE cannot now use that internal process as both sword and shield—first to decide the commission allocation internally, and then to argue that Plaintiffs are barred from judicially challenging CBRE's own wage violations, contractual breaches, retaliation, and tortious conduct. CBRE is equitably estopped from taking that position after Mid-Atlantic leadership approved Plaintiffs to proceed under the OBOP and after CBRE accepted the benefits of Plaintiffs' performance. Nor can Mr. Schippits, who is not a signatory to Plaintiffs' arbitration agreements, invoke those provisions to shield himself from liability for his own retaliatory conduct under the WPCL.

72.     Plaintiffs' claims therefore are properly before this Court. To the extent CBRE disputes that conclusion, declaratory relief is necessary and appropriate.

## COUNT I

### Breach of Contract

73.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

74.     Each Plaintiff entered into valid, binding, and enforceable Employment Agreements with CBRE. Those agreements incorporated CBRE's relevant policies by reference and required CBRE to calculate and pay commission wages and related compensation in accordance with those policies.

75.     Plaintiffs performed their obligations under the Employment Agreements, including by originating, managing, and executing the D.C. Office Transaction and otherwise providing the services required of them by CBRE.

76.     CBRE breached the Employment Agreements by, among other things, misallocating the D.C. Office Transaction commission contrary to the governing policies, repudiating the Mid-Atlantic leadership approval on which Plaintiffs relied to proceed under the OBOP, failing to pay Plaintiffs the disputed commission wages owed to them from the D.C. Office Transaction, and failing to credit the D.C. Office Transaction commission properly as 2025 production for purposes of related production-based compensation.

77.     As a direct and proximate result of CBRE's breaches, Plaintiffs have suffered damages in an amount to be proven at trial, including several million dollars in unpaid D.C. Office Transaction commission wages and related production-based compensation.

## COUNT II

### Declaratory Judgment

78.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

79.     An actual and justiciable controversy exists between the Parties concerning the legal effect of CBRE's December 30, 2025, internal decision and the scope and effect of CBRE's internal dispute process and arbitration provisions.

80.     Plaintiffs contend, and CBRE denies, that the December 30, 2025, internal decision does not bar or preclude Plaintiffs' legal claims against CBRE; that Plaintiffs' claims are not subject to mandatory arbitration; that the D.C. Office Transaction commission was earned in 2025 and must be credited as 2025 production; that CBRE's policies require commission allocation based on actual relative contributions; and that CBRE is equitably estopped from invoking a supposed SPOC violation after Mid-Atlantic leadership evaluated that issue and authorized Plaintiffs to proceed.

81.     A declaratory judgment will clarify and settle the legal relations at issue and terminate the uncertainty and controversy giving rise to this action.

## COUNT III

### Violation of the District of Columbia Wage Payment and Collection Law – Unpaid Wages and Bonuses

82.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

83.     At all relevant times, Plaintiffs were employees of CBRE within the meaning of the WPCL, and CBRE was their employer within the meaning of the statute.

23

84.    The disputed D.C. Office Transaction commission wages and related production-based compensation are "wages" within the meaning of the WPCL, including D.C. Code § 32-1301(3).

85.    CBRE was required to pay Plaintiffs all wages earned on the regular paydays designated in advance. Instead, CBRE failed and refused to pay Plaintiffs the disputed commission wages and related production-based compensation that they earned through the D.C. Office Transaction.

86.    CBRE's nonpayment of those disputed wages and bonuses violated the WPCL and caused Plaintiffs to suffer damages in an amount to be proven at trial.

87.    Plaintiffs do not in this count seek duplicate recovery for the narrow statutory late-payment claims tied solely to the conceded D.C. Office Transaction commission wages or the Additional Commission Wages Due wages, which are being pursued separately through the District's administrative wage process.

88.    Pursuant to D.C. Code § 32-1308, Plaintiffs are entitled to unpaid wages, liquidated damages, statutory penalties, reasonable attorneys' fees, costs, and all other relief permitted by law.

## COUNT IV

### Violation of the District of Columbia Wage Payment and Collection Law – Retaliation
### (Against CBRE and Peter Schippits)

89.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

90.    Plaintiffs engaged in protected activity under the WPCL by complaining internally about unpaid and untimely wages, objecting to the withholding of the undisputed portion of the D.C. Office Transaction commission, invoking Policy 10.11's express no-suspense language, asserting

24

rights under the governing agreements and District of Columbia wage law, and threatening to pursue legal remedies if CBRE failed to pay the wages due.

91.     After Plaintiffs engaged in protected activity, CBRE and Schippits retaliated against them by, among other things, withholding conceded funds, inventing extra-textual approval conditions, using the December 30, 2025 internal decision to formalize and perpetuate an adverse compensation outcome, excluding Mr. Inman from the process that determined his compensation, and directing, participating in, or ratifying the untimely payment of conceded D.C. Office Transaction commission wages and Additional Commission Wages Due wages after Plaintiffs had asserted their wage rights.

92.     On information and belief, Mr. Schippits knew of Plaintiffs' protected complaints before he issued the December 30, 2025, decision and directed, ratified, or participated in both categories of adverse action at issue here: (i) the retaliatory internal decision and CBRE's reliance on that decision to justify withholding disputed D.C. Office Transaction commission wages and related production-based compensation; and (ii) the refusal to pay the conceded D.C. Office Transaction commission wages on the next payroll, the continued withholding of those funds unless Plaintiffs accepted extra-textual conditions, and the delayed payment of conceded Additional Commission Wages Due after Plaintiffs had asserted their wage rights. Those adverse actions occurred within 90 days of Plaintiffs' protected activity and are presumptively retaliatory under D.C. Code § 32-1311.

93.     The retaliatory conduct of CBRE and Mr. Schippits—including both the retaliatory internal decision and the retaliatory untimely payment of conceded wages—was materially adverse, penalized Plaintiffs for asserting wage rights, and violated D.C. Code § 32-1311. Each is liable under that statute because it authorizes relief against an employer and any other person who retaliates.

25

94.     As a direct and proximate result of Defendants' retaliation, Plaintiffs suffered economic harm, emotional distress, and other damages to be proven at trial, and they are entitled to all relief authorized by statute, including civil penalties, liquidated damages, front pay, lost compensation, attorneys' fees, costs, and appropriate equitable relief.

## COUNT V

### Intentional Infliction of Emotional Distress

95.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

96.     CBRE's conduct was extreme and outrageous. Among other things, CBRE leveraged a biased and ever-changing internal process to strip Plaintiffs of millions of dollars in earned compensation, excluded Mr. Inman from the very process that determined his pay, conditioned the release of conceded wages on invented requirements not found in any governing policy, telegraphed that senior leadership had prejudged the supposed SPOC issue before the internal process began, retreated from leadership approvals on which Plaintiffs had been instructed to rely, and attempted to use its internal process to foreclose Plaintiffs' access to legal relief.

97.     That conclusion is reinforced by the fact that Defendants' conduct did not merely violate contractual and statutory obligations; it also contradicted CBRE's own repeated public statements that it maintains a values-driven culture grounded in respect, integrity, service, and excellence.

98.     CBRE either intended to cause Plaintiffs severe emotional distress or acted with reckless disregard of the near certainty that such distress would result.

99.     CBRE's conduct in fact caused Plaintiffs severe emotional distress, including sleeplessness, anxiety, physical exhaustion, and profound disruption to their professional and personal lives.

100.    As a direct and proximate result of CBRE's conduct, Plaintiffs are entitled to recover compensatory damages for emotional distress and, to the extent permitted by law, punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and award the following relief:

A.  Unpaid D.C. Office Transaction commission wages and related production-based compensation in an amount to be proven at trial;

B.  A declaration that CBRE's December 30, 2025, internal decision and Policy 10.11 do not bar Plaintiffs' legal claims, that Plaintiffs' claims are not subject to mandatory arbitration, and that the D.C. Office Transaction commission must be credited as 2025 production;

C.  All liquidated damages, statutory penalties, attorneys' fees, costs, and other relief available under the WPCL, including D.C. Code §§ 32-1308 and 32-1311;

D.  Compensatory damages for emotional distress and all other damages recoverable on the intentional-infliction claim, including punitive damages to the extent permitted by law;

E.  Pre-judgment and post-judgment interest;

F.  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury on all issues so triable.

27

Dated: March 23, 2026

Respectfully submitted,

*/s/ Tatiana Sainati*

Tatiana Sainati (D.C. Bar No. 156105)
Olaoluwaposi O. Oshinowo (D.C. Bar No. 1045617)
Savanna L. Shuntich (D.C. Bar No. 1034411)
Christina Lucas (D.C. Bar No. 90018620)
tsainati@wiley.law
ooshinowo@wiley.law
sshuntich@wiley.law
cvlucas@wiley.law
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000 (tel)
(202) 719-7049 (fax)

*Counsel for Plaintiffs Lou Christopher, Jordan Brainard, and Asher Inman*