**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LOU CHRISTOPHER, *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 1:26-cv-00996-CRC |
| ) | |
| CBRE, INC., *et al.*, ) | |
| ) | |
| *Defendants*. ) | |

**BRIEF IN SUPPORT OF MOTION TO DISMISS AND COMPEL ARBITRATION**

**CBRE, INC. AND PETER SCHIPPITS**
By Counsel

John E. Thomas, Jr. (D.C. Bar No. 1049100)
Richard J. Batzler (D.C. Bar No. 90011085)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, Virginia 22102
T: (703) 712-5407
F: (703) 712-5050
jethomas@mcguirewoods.com
rbatzler@mcguirewoods.com

Defendants CBRE, Inc. and Peter Schippits (collectively, "Defendants") move to dismiss the Complaint pursuant to Rules 12(b)(1), (3), and (6) of the Federal Rules of Civil Procedure and to compel arbitration pursuant to Sections 2, 3, and 4 of the Federal Arbitration Act.

## I.   **INTRODUCTION**

Despite their unequivocal contractual obligation to bring claims against CBRE in confidential arbitration, Plaintiffs instead filed this lawsuit in federal court.  The Court should compel arbitration based on the straightforward application of the Federal Arbitration Act ("FAA") (9 U.S.C. §§ 1–16) and controlling case law.  Where a valid arbitration agreement exists and covers the claims in dispute, the Court must grant a motion to compel arbitration.  Here, each Plaintiff undisputedly contracted with CBRE to bring all legal claims against CBRE—specifically including those raised in this lawsuit—in confidential arbitration.  Accordingly, the Court should grant Defendants' motion and compel arbitration.

## II.   **FACTUAL BACKGROUND**

### A.   **Plaintiffs' Contracts with CBRE**

#### 1.   **Louis Christopher**

Plaintiff Louis Christopher ("Christopher") joined CBRE as a commercial real estate broker in January 2012, pursuant to a Broker-Salesperson Contract, an Indemnity Agreement, and a First Addendum to the Broker-Salesperson Contract.  *See* **Exhibit 1**[1]; *see also* Revised Complaint, ECF No. 2-1 ("Compl.") ¶¶ 9, 21.  Christopher's Broker-Salesperson Contract dated January 27, 2012 ("Christopher's BSC") provides for mandatory arbitration of disputes with CBRE:

---

[1]   Declarations, affidavits, contracts, and other documents are appropriately considered by the Court in ruling on a motion to dismiss and compel arbitration. *See Brown v. Dorsey & Whitney, LLP*, 267 F. Supp. 2d 61, 66–67 (D.D.C. 2003).

> ***The claims and disputes subject to arbitration include all claims arising from or related to Salesperson's employment*** or the termination of Salesperson's employment, ***including but not limited to, claims for wages or other compensation due; claims for breach of any contract or covenant*** (express or implied); ***tort claims***; claims for discrimination (including, but not limited to, race, sex, religion, national origin, age, marital status, or medical condition or disability); claims for benefits (except where an employee benefit or pension plan specifies that its claims procedure shall culminate in an arbitration procedure different from this one); ***and claims for violation of any federal, state, or governmental law, statute, regulation, or ordinance***.

**Exhibit 1** ¶ 18 (emphasis added).  Under the mandatory arbitration provision, CBRE agreed to pay for all fees and costs of the arbitrator.[2]

### 2.     Jordan Brainard

Plaintiff Jordan Brainard ("Brainard") joined CBRE in February 2012.  *See* Compl. ¶ 10. In January 2020, Brainard signed a Broker-Salesperson Contract, First Addendum to the Broker-Salesperson Contract, and Indemnity Agreement.  **Exhibit 2**; *see also* Compl. ¶ 22.  Like Christopher's BSC, Brainard's Broker-Salesperson Contract ("Brainard's BSC") provides for mandatory arbitration:

> As a condition of employment and pursuant to the Federal Arbitration Act, ***in the event of any dispute or claim between Salesperson and CBRE*** (including all of its employees, officers, directors, agents, subsidiary and affiliated entities, benefit plans, benefit plans' sponsors, fiduciaries, administrators, and affiliates, and all successors and assigns of any of them), ***CBRE and Salesperson jointly agree to submit all such disputes or claims to confidential binding arbitration*** and waive any right to a jury trial.

---

[2]     The second-to-last sentence of Paragraph 18 in Christopher's BSC was replaced with the following in the First Addendum to the Christopher BSC dated January 27, 2012: "The arbitration (i) shall be conducted pursuant to the provisions of the arbitration rules of Washington D.C. or in absence of such law, the Federal Arbitration Act; and (ii) shall be heard before a retired State or Federal judge in Washington D.C. who is associated with the McCammon Group or other similar arbitration and mediation group." *See* **Exhibit 1** ¶ 31.

*Id.* ¶ 18(A) (emphasis added).[3]  Covered claims expressly include:

> ***all claims arising from or related to Salesperson's employment*** or the termination of Salesperson's employment ***including, but not limited to, claims for wages or other compensation due; claims for breach of any contract or covenant*** (express or implied); ***tort claims***; claims for misappropriation of trade secrets or unfair competition; claims for discrimination, harassment, and/or retaliation (including, but not limited to, claims based on race, sex, religion, national origin, age, marital status, or medical condition or disability); claims for benefits (except where an employee benefit or pension plan specifies that its claims procedure shall culminate in an arbitration procedure different from this one); ***and claims for violation of any federal, state, or governmental law, statute, regulation, or ordinance***.

*Id.* ¶ 18(B) (emphasis added).  Under Brainard's BSC, the mandatory arbitration is subject to JAMS Employment Arbitration Rules & Procedures (which were incorporated into Brainard's BSC by reference),[4] and CBRE will pay all fees and costs of the Arbitration, including any fees and costs that would be incurred in a court proceeding.  *Id.* ¶ 18(E), (F).

### 3.    Asher Inman

Plaintiff Asher Inman ("Inman") joined CBRE in September 2021 and signed a Broker-Salesperson Contract, Offer Letter, Second Addendum, and Indemnity Agreement with CBRE. Compl. ¶¶ 11, 23.   In all relevant aspects, including the mandatory arbitration provision in Paragraph 18, Inman's Broker-Salesperson Contract ("Inman's BSC") was identical to Brainard's BSC, and none of his other agreements altered the mandatory arbitration provision.  *See* **Exhibit 3** ¶ 18.

---

[3]    None of the other applicable contractual documents modify this arbitration provision, and instead reaffirm in each instance that Brainard is obligated to resolve disputes with CBRE through arbitration.

[4]    Rule 11(b) of the JAMS Employment Arbitration Rules & Procedures ("JAMS Rules") provides that "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator." JAMS  Employment  Arbitration  Rules  &  Procedures  (June  1,  2021), https://www.jamsadr.com/rules-employment-arbitration.

### B.      Despite Agreeing to Arbitrate, Plaintiffs Filed This Action

According to the Complaint, Plaintiffs were involved in a real estate brokerage transaction in Washington, D.C. that closed on October 30, 2025. *See* Compl. ¶¶ 30–43.  Following the completion of the transaction, the Plaintiffs and other CBRE brokers were unable to reach an agreement on how to allocate the commission among themselves. *Id.* ¶¶ 44–45.  As a result, CBRE implemented its internal dispute resolution process, to which Plaintiffs had contractually agreed. Plaintiffs were dissatisfied with the result of that dispute resolution process.  They also claim to be dissatisfied with the speed with which CBRE paid them commissions. *See* Compl. ¶¶ 50–56.

In disregard of each of their promises to arbitrate claims against CBRE, Plaintiffs filed this action against Defendants.  Plaintiffs do not dispute entering into arbitration agreements with CBRE—indeed, they bring legal claims based on these very contracts. *See* Compl. ¶¶ 73–77. Plaintiffs made a conscious, strategic decision to violate their arbitration agreements by filing their legal claims in a public forum.

## III.    ARGUMENT

### A.      Legal Standard for Arbitration of Claims

Defendants seek dismissal or compelled arbitration alternatively pursuant to Rules 12(b)(1), (3), and (6), and pursuant to the FAA.  Federal courts have applied both bodies of law to give effect to arbitration provisions, and the D.C. Circuit has not definitively resolved which procedural vehicle is most appropriate. *See, e.g.*, *Andrews v. TD Ameritrade, Inc.*, 596 F. App'x 366, 370, 372 (6th Cir. 2014) (applying Rule 12(b)(1)); *Gezu v. Charter Comm'cns*, 17 F.4th 547, 552–54 (5th Cir. 2021) (applying Rule 12(b)(3)); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (applying Rule 12(b)(6)); *Andresen v. Intepros Fed., Inc.*, No. 15-446 (EGS), 2024 WL 4164660, at *10 (D.D.C. Sept. 12, 2024) ("Defendants can move to compel arbitration pursuant to 9 U.S.C. § 4 of the FAA and to dismiss the action all in the same motion.") (collecting

cases).  *Cf. Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) (holding court must stay, rather than dismiss, case pending arbitration if a party requests a stay).

Pursuant to the FAA, the arbitration provisions in any "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "The Supreme Court and the District of Columbia Circuit have both held that the provisions of the FAA are applicable to agreements to arbitrate contained in employment contracts."  *Brown*, 267 F. Supp. 2d at 69 (collecting cases).  "In resolving a motion to compel arbitration, the focus is on the arbitrability of the dispute rather than the dispute itself, and accordingly, a court may not weigh the merits of a grievance when determining whether to compel arbitration."  *Sakyi v. Estée Lauder Cos., Inc.*, 308 F. Supp. 3d 366, 375 (D.D.C. 2018) (citations and internal quotation marks omitted).  Rather, the Court's sole inquiry is whether the parties agreed to arbitrate the matters at issue.  *Id.* at 376.

In ruling on a motion to dismiss or compel arbitration, the Court can consider documents outside of the pleadings.  *Brown*, 267 F. Supp. 2d at 67; *see also Andresen*, 2024 WL 4164660, at *10.  The Court's analysis involves a two-step inquiry.  *See Sheet Metal Workers' Int'l Ass'n v. United Transp. Union*, 767 F. Supp. 2d 161, 169 (D.D.C. 2011).  First, the Court must determine whether the parties entered into a valid and enforceable arbitration agreement.  *See id.*; *Reinhardt v. Guidehouse Inc.*, No. 22-1237, 2025 WL 2603688, at *4 (D.D.C. Sept. 9, 2025).  Second, absent a clear delegation of arbitrability to the arbitrator, the Court must determine whether the arbitration agreement encompasses the claims alleged in the Complaint.  *Reinhardt*, 2025 WL 2603688, at *4.  The party opposing arbitration bears the burden of proving the agreement is invalid or that the claims are not arbitrable.  *See Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 92 (2000).

"[T]he 'party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made.  This burden does not require the moving party to show initially that the agreement would be *enforceable*, merely that [an arbitration agreement] existed.'"  *Sakyi*, 308 F. Supp. 3d at 375 (quoting *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010)).  "The burden then shifts to plaintiffs to show that there is a genuine issue of material fact as to the making of the agreement."  *Haire v. Smith, Currie & Hancock LLP*, 925 F. Supp. 2d 126, 129 (D.D.C. 2013).

## B.    The Court Must Compel Arbitration of All Claims

Section 2 of the FAA mandates that binding arbitration agreements are valid, irrevocable, and enforceable.  *See* 9 U.S.C. § 2.  This law reflects a "liberal federal policy favoring arbitration," requiring courts to "place arbitration agreements on an equal footing with other contracts . . .  and enforce them according to their terms."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (cleaned up); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).

The FAA embodies a strong federal policy favoring the enforcement of arbitration agreements.  Indeed, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

Because the parties undisputedly agreed to arbitrate claims between each other, including all of the claims at issue in this litigation, the Court should compel arbitration of all of Plaintiffs' claims in this action.

### 1.    Each Plaintiff Signed a Valid Agreement to Arbitrate.

Because arbitration is a matter of contract, the first question in deciding a motion to compel arbitration is whether the parties entered into a valid agreement to arbitrate.  *Sakyi*, 308 F. Supp.

at 376.  In this case, each Plaintiff signed their respective Broker-Salesperson Contracts, which included the mandatory arbitration provision.  *See* **Exhibits 1**–**3** ¶ 18.  Indeed, Brainard and Inman not only signed the agreements, but also signed their initials immediately below the arbitration provision.  *See* **Exhibits 2** & **3** ¶ 18.  Affixing a signature or initials to an agreement that contains an arbitration provision establishes mutual assent.  *See Pearson v. Sunnova Energy Int'l*, No. 1:25-cv-00251, 2025 WL 2374575, at *4 (D.D.C. Aug. 14, 2025).  These agreements were facially supported by exchanged obligations and were entered into by business professionals.

Whether Plaintiffs signed the agreements is not in doubt.  Indeed, Plaintiffs' breach-of-contract cause of action is brought pursuant to those very same agreements.  *See* Compl. ¶¶ 73–77.  Moreover, despite acknowledging the arbitration agreements in their Complaint, Plaintiffs make no effort to suggest that they either did not sign the agreements or that the agreements are otherwise invalid.  *See id.* ¶¶ 70–72.

The FAA establishes the validity and enforceability of written agreements to arbitrate disputes, and there is no genuine dispute that each Plaintiff entered into a valid agreement to arbitrate with CBRE.

### 2. The Arbitrability of Plaintiffs' Disputes Must Be Resolved by the Arbitrator, Rather Than the Court.

After determining that valid arbitration agreements exist, the Court next looks to the issue of arbitrability of the claims.  *See Pearson*, 2025 WL 2374575, at *5.  Generally, the question of whether a dispute is arbitrable is subject to judicial determination pursuant to state contract law principles.  *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  However, parties to a contract may delegate questions of arbitrability to an arbitrator if the contract "clearly and unmistakably" demonstrates that intent.  *Id.*; *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  When parties adopt "broad, all-encompassing language" in

an arbitration agreement, including that the parties must arbitrate "any dispute" between the parties, this serves as the sufficient "clear evidence" that the parties agreed to arbitrate the question of arbitrability. *See Sakyi*, 308 F. Supp. 3d at 378. "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." *Henry Schein Inc. v. Archer & White Sales Inc.*, 586 U.S. 63, 65 (2019).

In this case, the question of arbitrability is reserved for the arbitrator in the first instance. Christopher, Brainard, and Inman all separately agreed to submit "any dispute or claim" between each respective salesperson and CBRE (including all of its employees and agents) to "confidential binding arbitration." *See* **Exhibit 1** (Christopher BSC) ¶ 18[5]; **Exhibit 2** (Brainard BSC) ¶ 18(A); **Exhibit 3** (Inman BSC) ¶ 18(A). Given the breadth of this agreement, each of the Plaintiffs has agreed to submit the question of arbitrability of any disputes between themselves and CBRE to an arbitrator. *See Sakyi*, 308 F. Supp. 3d at 378 ("Here, the Arbitration Agreement provides that the plaintiff must arbitrate 'any dispute . . . against Aveda Institute [. . .] without limitation, . . . no matter how characterized, pleaded or styled.' [. . .] This 'broad, all-encompassing language' is 'clear evidence that the parties agreed to arbitrate all issues' arising between them, including the question of arbitrability." (cleaned up)); *see also Johnson v. ACB Ideas, LLC*, No. 1:23-cv-02944 (RCL), 2024 U.S. Dist. LEXIS 114097, at *22 (D.D.C. June 28, 2024) ("Courts in this district have held that arbitration clauses containing sweeping language such as 'arising out of' evince the parties' intent to submit arbitrability questions to the arbitrator.").

Furthermore, Brainard's and Inman's BSCs expressly incorporate the "JAMS Employment Arbitration Rules & Procedures." **Exhibit 2** (Brainard BSC) ¶ 18(E); **Exhibit 3** (Inman BSC) ¶

---

[5]     To be clear, Christopher's BSC includes a narrow carve-out for certain disputes with other CBRE brokers. **Exhibit 1** (Christopher BSC) ¶ 18. That carve-out is inapplicable in this case, as explained in greater detail below, and in any event, it does not address the question of arbitrability.

18(E).  Rule 11(b) of the JAMS Rules provides that "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, ***shall be submitted to and ruled on by the Arbitrator***."  JAMS Employment Arbitration Rules & Procedures (June 1, 2021)  (emphasis  added),  https://www.jamsadr.com/rules-employment-arbitration.  The  D.C. Circuit holds that "the requisite clear and unmistakable delegation occurs when the parties' agreement incorporates arbitral rules that in turn assign questions of arbitrability to the arbitrator." *Comm'cns Workers of Am. v. AT&T Inc.*, 6 F.4th 1344, 1348 (D.C. Cir. 2021).  Judges in this District have repeatedly held that the incorporation of the rules of an arbitration association like JAMS "makes the issue of arbitrability one for the arbitrator, not the court, to decide."  *Sakyi*, 308 F. Supp. 3d at 378 (collecting cases involving arbitration agreements incorporating AAA rules). "[E]very circuit court to address this question has reached the same conclusion."  *Id.* at 379–80 (collecting cases, including cases involving agreements incorporating JAMS rules).  Accordingly, this provides an additional, independent basis to submit the threshold question of arbitrability of Brainard's and Inman's claims to arbitration.

> **3.    Even if the Court Decided Arbitrability, Plaintiffs' Claims are Arbitrable.**

As discussed above, the question of whether Plaintiffs' claims are arbitrable is one reserved for the arbitrator in the first instance, which must result in the Court compelling arbitration.  If the Court were to disagree, however, and hold that the question of arbitrability is for this Court, then the Court should nevertheless hold that the issues in this lawsuit are arbitrable, sending this case to arbitration for that reason.

Pursuant to the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25; *see also*

*Reinhardt*, 2025 WL 2603688, at *12 ("If there is any ambiguity or doubt over whether a claim is covered by the Arbitration Agreement, any doubts are to be resolved in favor of arbitration.").

As discussed below, Plaintiffs' claims are plainly within the scope of the broad arbitration provisions in each of their contracts, which encompass "any dispute or claim between" each Plaintiff and "CBRE." **Exhibits 1–3** at ¶ 18.

> a.    **Plaintiffs' Claims Are Expressly Covered by the Arbitration Provisions.**

Each of Plaintiffs' claims in this action are claims against CBRE and are therefore within the scope of the arbitration provisions.  Furthermore, each contract contains a non-exclusive list of covered claims, which explicitly covers all of the contractual, statutory, and tort claims raised by Plaintiffs.  *Compare* Compl. ¶¶ 73–100, *with* **Exhibits 1–3** at ¶ 18.  Plaintiffs' claims for breach of contract, claims of violation of D.C. law, request for related declaratory judgment, and common law tort claims for "intentional infliction of emotional distress" are all encompassed by this express, non-exhaustive list.  There is no question or ambiguity that these provisions cover Plaintiffs' claims, but even if there was, any doubts must be resolved in favor of arbitration.  *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25.

> b.    **The Narrow Arbitration Exceptions in Christopher's BSC Do Not Apply.**

In an apparent attempt to suggest that some of Christopher's claims are not subject to arbitration, Christopher mentions that his Broker-Salesperson Contract "excludes from arbitration disputes that CBRE is authorized to resolve under paragraph 11 or CBRE's policies, including Policy 10.11." Compl. ¶ 70.  The arbitration provision in Christopher's BSC—but not Jordan's or Inman's BSCs—provides that while any disputes or claims "between Salesperson and CBRE" (including related claims against its employees) are subject to arbitration, arbitration does not apply to "any dispute which CBRE is authorized to resolve pursuant to any other provision

10

contained in this or any other contract with CBRE (including but not limited to paragraph 11, above) or CBRE's General Rules & Policies (including but not limited to Section 10.11)." **Exhibit 1 ¶ 18.** As discussed below, that language in Christopher's BSC does not change the outcome in this case.

Paragraph 11 of Christopher's BSC provides:

> If any dispute arises between Salesperson and any other broker or salesperson (whether or not working for CBRE), CBRE, in its sole discretion, shall have the right to settle the dispute and such settlement shall be binding upon Salesperson.

**Exhibit 1 ¶ 11.** This lawsuit is not a dispute among brokers, but rather a dispute between employer and (former) employees. Furthermore, CBRE does not have the right to resolve disputes between brokers and CBRE (as opposed to disputes between brokers). Accordingly, the reference to Paragraph 11 in Paragraph 18 of Christopher's BSC has no bearing on the question of arbitrability of this lawsuit.

Likewise, CBRE Policy 10.11 applies only to resolution of certain "disputes between Sales Professionals." *See* **Exhibit 4**. CBRE's internal policy does not give CBRE the right to resolve legal disputes it has with its employees; only disputes between employees themselves. Accordingly, the reference to Policy 10.11 in Paragraph 18 of Christopher's BSC also has no bearing on the question of arbitrability of this lawsuit.[6]

To be clear, employers have no right to unilaterally resolve: (1) statutory wage claims that employees file against an employer; (2) an employee's claim that the employer breached a contract with the employee; or (3) an employee's claim that the employer intentionally caused the employee

---

[6]   The fact that Count IV, alone, includes Schippits as an additional defendant does not change this analysis either. Count IV is not a dispute between brokers subject to CBRE's internal resolution, but rather a statutory wage claim between an employer and employee. *See* Compl. ¶¶ 89–94.

emotional distress.[7]   And no allegation in the Complaint challenges this common-sense proposition.

### C.      Schippits May Also Enforce the Arbitration Agreement.

In addition to and in conjunction with CBRE, Schippits is entitled to compel arbitration under each Plaintiff's arbitration agreement.   Arbitration agreements can be applied to non-signatories under traditional principles of contract and agency law, including among others incorporation by reference, third-party beneficiary, and estoppel theories.   *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 97 (D.D.C. 2012).

Here, multiple well-established common law principles extend the arbitration provisions to Schippits—a CBRE managing agent and employee.

First, each Plaintiff specifically agreed that mandatory arbitration extends to all claims against CBRE agents and employees.  **Exhibit 2** (Brainard BSC) ¶ 18(A); **Exhibit 3** (Inman BSC) ¶ 18(A); **Exhibit 1** (Christopher BSC) ¶ 18.  This indisputably extends to Schippits, who Plaintiffs admit was a CBRE employee and agent who was acting on behalf of CBRE during the relevant period.  *See* Compl. ¶¶ 14, 59, 65.  Accordingly, in agreeing to arbitrate disputes against CBRE and its employees and agents, each Plaintiff also agreed to arbitrate wage claims against Schippits, and it would be inequitable for the Plaintiffs to avoid arbitration with him.  *See Riley v. BMO Harris Bank, N.A.*, 61 F. Supp. 3d 92, 101 (D.D.C. 2014).

---

[7]      Of course, CBRE does not waive the argument that pursuant to Policies 10.11 and 10.12, it was authorized to resolve disputes among brokers over commissions allocations before any commission was deemed "earned" under the relevant contracts and policies.  Indeed, this is the commissions agreement Plaintiffs entered into, operated under for years, and then attempted to disavow months before their departure.   While CBRE is authorized to determine when commissions are earned, CBRE is not authorized to resolve employees' statutory wage claims that employees may lodge against CBRE.  Those claims are governed by the arbitration provisions in Paragraph 18, not the internal dispute resolution protocols in Paragraph 11.

Second, Schippits can compel arbitration as a third-party beneficiary of each of Plaintiffs' arbitration agreements. Under D.C. law, a non-party to a contract "nonetheless may sue to enforce its provisions if the contracting parties intend the third party to benefit directly thereunder." *Western Union Telegraph Co. v. Massman Const. Co.*, 402 A.2d 1275, 1277 (D.C. 1979). This third-party beneficiary principle applies to protect defendant employees where, as here, an arbitration agreement with a plaintiff's employer expressly extends to disputes with the employer's "employees" or "agents." *Reinhardt*, 2025 WL 2603688, at *11. There is no dispute that Schippits—a CBRE "regional President" sued for acting in the scope of his employment—is an intended beneficiary covered by the contractual language in each arbitration agreement.

Third, the fact that Plaintiffs' claims against Schippits are intertwined with the claims against CBRE provides an independent basis to submit the claims against Schippits to arbitration. "Under the doctrine of estoppel, a non-signatory [to an arbitration provision] can compel arbitration with a signatory 'when the non-signatory is seeking to resolve issues that are intertwined with an agreement that the signatory has signed.'" *Riley*, 61 F. Supp. 3d at 98–99 (quoting *Fox v. Computer World Servs. Corp.*, 920 F. Supp. 2d 90, 103 (D.D.C. 2013)); *see also Sakyi*, 308 F. Supp. 3d at 385–87 (applying this principle to extend arbitration agreement to non-signatories where overlapping claims were alleged based on the same set of operative facts). Here, Plaintiffs' single claim against Schippits is a statutory commissions claim based on a claimed commissions entitlement arising under the Plaintiffs' respective employment contracts with CBRE. *See* Compl. ¶¶ 21–23, 89–94. Under D.C. common law, the fact that these claims are intertwined allows Schippits to compel this claim to arbitration. *See Riley*, 61 F. Supp. 3d at 99–100 (arbitration provision extends to non-signatory when party brings claims against the non-signatory deriving from written agreement containing an arbitration clause).

## IV.  CONCLUSION

No genuine dispute exists that the Plaintiffs contractually agreed to confidentially arbitrate these claims against CBRE and Schippits.  Accordingly, this Court should compel Plaintiffs' claims to arbitration and dismiss this action, or alternatively compel arbitration and stay this action.

Dated: April 17, 2026.                    Respectfully submitted,

*/s/ Richard J. Batzler*
John E. Thomas, Jr. (D.C. Bar No. 1049100)
Richard J. Batzler (D.C. Bar No. 90011085)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, Virginia 22102
T: (703) 712-5407
F: (703) 712-5050
jethomas@mcguirewoods.com
rbatzler@mcguirewoods.com

**ATTORNEYS FOR DEFENDANTS
CBRE, INC. AND PETER SCHIPPITS**

14

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2026, a true and correct copy of the foregoing was served

via the Court's CM/ECF electronic filing and notification system on all counsel of record.


*/s/ Richard J. Batzler*
Richard J. Batzler (D.C. Bar No. 90011085)

15