**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LOU CHRISTOPHER**, *et al.*<br>Plaintiffs,<br>v.<br>**CBRE, INC.**, *et al.*<br>Defendants. | Case No. 26-cv-996 (CRC) |

**OPINION AND ORDER**

Real estate brokers Lou Christopher, Jordan Brainard, and Asher Inman sued their employer CBRE, Inc. and their manager Peter Schippits following a disagreement about how to split the commission from a large transaction. Defendants move to compel arbitration, arguing that Plaintiffs' employment contracts require their claims to be resolved by an arbitrator. The Court will grant the motion.

## I. Background

Plaintiffs were brokers in the Washington, D.C. office of CBRE, a real estate services and investment firm. See Compl., Dkt. 15 ¶¶ 9–13. In October 2025, CBRE closed a large lease deal, yielding millions in commissions. See id. ¶¶ 1, 3, 48, 67–68. Plaintiffs and other CBRE brokers could not agree how to split those commissions. See id. ¶¶ 49–51, 56–65. Dissatisfied with CBRE's internal dispute-resolution process, see id. ¶¶ 62–67, Plaintiffs sued CBRE and Mr. Schippits on a variety of contractual, tort, and statutory claims. See id. at ¶¶ 93–148.

Defendants moved to compel arbitration, arguing that Plaintiffs each had an "unequivocal contractual obligation to bring claims against CBRE in confidential arbitration." See Memo. in Support of Mot. to Compel Arbitration ("MTCA"), Dkt. 18 at 1, 6–15. Christopher's employment contract, executed in 2012, states:

> In the event of any dispute between [Christopher] and CBRE . . . . [Christopher] and CBRE jointly agree to submit all such disputes or claims to confidential binding arbitration and waive any right to a jury trial. The claims and disputes subject to arbitration include all claims arising from or related to Salesperson's employment or the termination of Salesperson's employment, including but not limited to, claims for wages or other compensation due; claims for breach of any contract or covenant (express or implied); tort claims; . . . and claims for violation of any federal, state, or governmental law, statute, regulation, or ordinance.

Dkt. 15-2 ¶ 18. An addendum executed a few days after the contract clarified that any arbitration "shall be conducted pursuant to the provisions of the arbitration rules of Washington D.C. or in absence of such law, the Federal Arbitration Act." Id. ¶ 31.

Brainard's contract, executed in 2020, states:

> As a condition of employment and pursuant to the Federal Arbitration Act, in the event of any dispute or claim between [Brainard] and CBRE . . . CBRE and [Brainard] jointly agree to submit all such disputes or claims to confidential binding arbitration and waive any right to a jury trial. The claims and disputes subject to arbitration include all claims arising from or related to [Brainard]'s employment . . . including, but not limited to, claims for wages or other compensation due; claims for breach of any contract or covenant (express or implied); tort claims; . . . retaliation . . . ; . . . and claims for violation of any federal, state, or governmental law, statute, regulation, or ordinance. . . . The arbitration [] shall be conducted pursuant to JAMS Employment Arbitration Rules & Procedures[.]

Dkt. 15-3 ¶ 18. Inman's contract, executed in 2021, contains provisions identical to those in Brainard's contract. See Dkt. 15-4 ¶ 18.

## II. Legal Standard

"[A]rbitration is a matter of contract." Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 69 (2010). The Federal Arbitration Act ("FAA") provides that a provision in a contract requiring the arbitration of disputes related to the contract "shall be valid." 9 U.S.C. § 2. Both federal and D.C. law recognize a strong presumption in favor of arbitration when arbitrability is in dispute. See Johnson v. ACB Ideas, LLC, No. 1:23-CV-02944 (RCL), 2024 WL 3225994, at *3 (D.D.C. June 28, 2024); Wash. Teachers' Union, Loc. No. 6 v. D.C. Pub. Schs., 77 A.3d 441, 456 (D.C.

2013). Notwithstanding a prior agreement to arbitrate, plaintiffs often attempt to resolve disputes in federal court. Section 4 of the FAA provides a remedy for the defendant: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

A court reviewing a motion to compel arbitration follows a two-step inquiry. "First, the court must decide whether the parties entered into a valid and enforceable arbitration agreement." Sheet Metal Workers' Int'l Ass'n v. United Transp. Union, 767 F. Supp. 2d 161, 169 (D.D.C. 2011); see Coinbase, Inc. v. Suski, 602 U.S. 143, 149 (2024) (holding that, "[b]efore referring a dispute to an arbitrator . . . the court determines whether a valid arbitration agreement exists" (citation omitted)). If so, the court then determines "whether the arbitration agreement encompasses the claims raised in the complaint." Id.

A motion to compel arbitration is evaluated under the summary-judgment standard prescribed by Federal Rule of Civil Procedure 56. See Early v. Ace Cash Checking, No. 26-cv-6 (SLS), 2026 WL 2224813, at *3 (D.D.C. Aug. 3, 2026). Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).

## III. Analysis

The parties dispute both steps of the motion-to-compel-arbitration inquiry as to all three Plaintiffs' arbitration agreements. The Court addresses each step in turn.

A. Whether the Parties Entered into a Valid and Enforceable Arbitration Agreement

The first step of the inquiry requires the party seeking arbitration to present "evidence sufficient to demonstrate an enforceable agreement to arbitrate." Williams v. Consumerinfo.com, Inc., No. 1:24-cv-02017 (RCL), 2024 WL 5186620, at *4 (D.D.C. Dec. 20, 2024) (citation omitted). The burden then moves to the nonmoving party "to show that there is a genuine issue of material fact as to the making of the agreement[]" that would prevent the court from deciding the motion as a matter of law. Haire v. Smith, Currie & Hancock LLP, 925 F. Supp. 2d 126, 129 (D.D.C. 2013). To determine whether the employment contracts here create valid and enforceable arbitration agreements, the Court looks to District of Columbia contract law. See Savostianov v. Fed. Advocs., Inc., No. CV 20-1711 (CKK), 2021 WL 1026018, at *3 (D.D.C. Mar. 17, 2021). "[T]he party asserting the existence of a contract to submit disputes to arbitration has the burden of proving its existence." Id. (citation omitted).

Defendants have carried their burden of showing evidence of a valid agreement to arbitrate. See Fox, 920 F. Supp. 2d at 96; see also MTCA at 1–4, 7–8. Indeed, there is no dispute that Plaintiffs each entered into an agreement to arbitrate supported by mutual consent and adequate consideration. See Reply at 2. Plaintiffs argue instead that those arbitration agreements are unenforceable because they "prospectively waive statutory rights to meaningful neutral review of wage violations." Resp. Br. at 21 (formatting altered). Defendants reply that the Court need not decide the enforceability of the arbitration agreements. In their view, that issue must be decided by the arbitrator in the first instance. See Reply at 6, 9.

The Court agrees. Under D.C. law, "the question of 'whether a contract containing a valid agreement to arbitrate is enforceable' is for the arbitrator and not the Court." Johansson v.

Cent. Props., LLC, 320 F. Supp. 3d 218, 221 (D.D.C. 2018) (quoting D.C. Code § 16-4406(c)); see Savostianov, 2021 WL 1026018, at *3.

For the benefit of the arbitrator, however, the Court concludes all three Plaintiffs' arbitration agreements are enforceable. Nothing in the arbitration agreements bars Plaintiffs from bringing their statutory claims in arbitration. To the contrary, the employment contracts provide that statutory claims *can* be raised there. See Dkt. 15-2 ¶ 18 (Christopher's contract: "The claims and disputes subject to arbitration include . . . claims for violation of any federal, state, or governmental law, statute, regulation, or ordinance."); Dkt. 15-3 ¶ 18 (same for Brainard's contract); Dkt. 15-4 ¶ 18 (same for Inman's contract). That clear language would seem to settle the issue.

Plaintiffs nonetheless argue that a provision in Christopher's contract renders his arbitration provision unenforceable. Specifically, Christopher's contract states that, although disputes or claims "between Salesperson and CBRE" are subject to arbitration, arbitration does not apply to "any dispute which CBRE is authorized to resolve pursuant to" either paragraph 11 of his contract or CBRE internal Policy 10.11. Dkt. 15-2 ¶ 18. Paragraph 11 of Christopher's contract in turn states, "[i]f any dispute arises between [Christopher] and any other broker or salesperson . . . CBRE, in its sole discretion, shall have the right to settle the dispute and such settlement shall be binding upon [Christopher]." Dkt. 15-2 ¶ 11. And CBRE Policy 10.11 creates an "internal arbitration" protocol for "final and binding decision[s] to resolve" "any Dispute between Sales Professionals." Dkt. 15-7 §§ III(A), (F)(1) (formatting altered). Plaintiffs argue that such provisions prevent "neutral review of adverse Policy 10.11 determinations regarding commission wages." Resp. at 22.

Neither paragraph 11 nor Policy 10.11 governs the disputes here. See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 681 (2010) ("[T]he interpretation of an arbitration agreement is generally a matter of state law[.]"); DCA Capitol Hill LTAC, LLC v. Capitol Hill Grp., 332 A.3d 518, 530 (D.C. 2025) (explaining that, under D.C. law, a court's first task at contract interpretation is to "assess the contract's plain language" based on "a reasonable person"). Paragraph 11 applies to disputes "between [Christopher] *and any other broker or salesperson*." Dkt. 15-2 ¶ 11 (emphasis added). Similarly, Policy 10.11 applies to "any Dispute *between Sales Professionals*." Dkt. 15-7 § III.A (emphasis added). Here, Plaintiffs bring claims against CBRE and Schippits, not any of their fellow brokers. And Plaintiffs do not contend that either CBRE or Schippits qualifies as a "broker," "salesperson," or "sales professional." As a matter of ordinary contract construction, then, paragraph 11 and Policy 10.11 do not bear on the validity of the arbitration provisions.

Plaintiffs' argument hinges less on the language of Christopher's contract than on potential litigation positions that Defendants might take in the future. According to Plaintiffs, if arbitration occurs, then Defendants will use paragraph 11 and Policy 10.11 to argue that the arbitrator lacks jurisdiction over their claims. The result will be a "heads I win, tails you lose" dilemma whereby Defendants defeat jurisdiction first in this forum and then in the arbitral forum, evading review of their conduct anywhere. Resp. at 22. But such speculation does not suffice to preclude enforcement of valid contracts, at least at this juncture. See Booker v. Robert Half Int'l, Inc., 413 F.3d 77, 81 (D.C. Cir. 2005) (Roberts, J.); cf. Data Mountain Sols., Inc. v.

Giordano, 680 F. Supp. 2d 110, 125–26, 128–29 (D.D.C. 2010) (discussing judicial estoppel in the context of inconsistent positions taken by a defendant between arbitration and litigation).[1]

In sum, Defendants have established that Plaintiffs agreed to valid and enforceable arbitration agreements.

B. Whether the Arbitration Agreement Encompasses the Claims in Dispute

The Court now turns to the second step of the motion-to-compel-arbitration inquiry. The parties disagree about who decides arbitrability—*i.e.*, whether the Court or the arbitrator must decide whether the arbitration agreements encompass the claims in dispute.

The "default rule" is that "the question of arbitrability is usually for the Court to decide." Haire, 925 F. Supp. 2d at 132. However, parties can override that default and "agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." Coinbase, 602 U.S. at 148 (citation omitted). "When deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc., 531 F.3d 863, 865 (D.C. Cir. 2008) (citation and ellipses omitted). "An order to arbitrate a particular grievance should not be denied unless" the court can be certain the

[1] In any event, Defendants do not argue that Plaintiffs' claims are unreviewable in arbitration. To the contrary, Defendants read the arbitration agreements to "provide for arbitration by a neutral arbitrator[.]" Reply at 12. It is "obvious," Defendants say, that the company "is not authorized to resolve claims against" itself. Reply at 6. Lest there be any doubt, Defendants expressly maintain that "CBRE does not have the right to resolve disputes between brokers and CBRE (as opposed to disputes between brokers)." MTCA at 12; see Reply at 4 n.4 ("Policy 10.11 does not authorize CBRE to resolve claims an employee files against CBRE."); MTCA at 12 & n.12 (similar). And, Defendants make clear, CBRE has "neither 'resolved' nor claimed the authority to resolve any of the causes of action filed against it." Reply at 7 n.8. Given the language of the contracts and Defendants' representations, the Court fails to see how the agreed-upon provisions at issue preclude arbitration as a neutral forum for Plaintiffs to pursue their statutory rights. See Am. Express Co. v. Italian Colors Restaurant, 570 U.S. 228, 235–36 (2013).

"arbitration clause is not susceptible of an interpretation that covers the asserted dispute." S.D.M. of Am. v. Centerra, No. 20-cv-2997 (CRC), 2023 WL 1964041, at *2 (D.D.C. Feb. 10, 2023) (cleaned up) (citation omitted).

Defendants argue that the arbitrator must determine the arbitrability of Plaintiffs' claims. See MTCA at 8–12. The Court agrees. The plain language of the arbitration agreements evinces the parties' clear and unmistakable intent for an arbitrator to determine arbitrability.

Christopher's arbitration agreement states that, "[i]n the event of any dispute between [Christopher] and CBRE . . . . [Christopher] and CBRE jointly agree to submit all such disputes or claims to confidential binding arbitration and waive any right to a jury trial." Dkt. 15-2 ¶ 18. Further, "[t]he claims and disputes subject to arbitration include all claims arising from or related to Salesperson's employment or the termination of Salesperson's employment[.]" Id. The language of Christopher's arbitration agreement is broad, and courts in this district routinely interpret such sweeping language as evidence of the parties' intent to submit arbitrability questions to the arbitrator. See Johnson v. ACB Ideas, LLC, No. 1:23-CV-02944 (RCL), 2024 WL 3225994, at *8 (D.D.C. June 28, 2024) (collecting cases). The breadth of this language thus provides an "independent" basis to conclude that Christopher agreed to arbitrate the question of arbitrability. Sakyi v. Estee Lauder Cos., Inc., 308 F. Supp. 3d 366, 378 (D.D.C. 2018). "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." Henry Schein Inc. v. Archer & White Sales Inc., 586 U.S. 63, 65 (2019).

The analysis is even more straightforward as to Brainard and Inman. Their arbitration agreements both state that "any dispute or claim between" them and CBRE must be submitted "to confidential binding arbitration," and that the arbitration "shall be conducted pursuant to JAMS Employment Arbitration Rules & Procedures[.]" Dkt. 15-3 ¶ 18 (Brainard); Dkt. 15-4 ¶

18 (Inman). These arbitration provisions reveal that the parties agreed to arbitrate the gateway question of arbitrability. As with Christopher's contract, the arbitration agreements in Brainard and Inman's contracts use "broad, all-encompassing language" that evidence the parties' agreement to arbitrate all issues between them, including arbitrability. Johnson, 2024 WL 3225994 at *8. Further, and independently, the arbitration agreements expressly incorporate the JAMS Rules. Rule 11(b) of those rules provides that "disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator." See JAMS Employment Arbitration Rules & Procedures Rule 11(b) (June 1, 2021); see also JAMS Employment Arbitration Rules & Procedures Rule 11(b) (July 1, 2014) (same). The D.C. Circuit has found a "clear and unmistakable delegation" of arbitrability questions exists when, as here, "the parties' agreement incorporates arbitral rules that in turn assign questions of arbitrability to the arbitrator." Commc'ns Workers of Am. v. AT&T, Inc., 6 F.4th 1344, 1347 (D.C. Cir. 2021).[2]

---

[2] Plaintiffs briskly challenge the validity of these JAMS-incorporation provisions in Brainard and Inman's contracts—which they call a "delegation provision"—arguing "the delegation provision would place the arbitrator in the impossible position of having to decide whether the arbitration agreement can be enforced to hear claims relating to Mr. Schippits' Policy 10.11 determination when the contract and incorporated policies simultaneously purport to make such determinations unreviewable." Resp. at 29–30. Relatedly, Christopher argues his arbitration agreement "explicitly excludes" his claims, because those claims originated in a decision made under Policy 10.11. Resp. at 18. Both arguments falter for the same reason: Policy 10.11 is not relevant to either the agreement-validity or arbitrability questions here. Again, Plaintiffs' claims target actions by Defendants and not by sales professionals. And Defendants disclaim that Policy 10.11 authorizes CBRE to resolve claims an employee files against the company. See Reply at 4 n.4 ("Policy 10.11 does not authorize CBRE to resolve claims an employee files against CBRE."); MTCA at 12 & n.12 (similar). Accordingly, the Court sees no reason not to enforce the arbitration agreements or the particular provisions at issue. See Rent-A-Ctr., 561 U.S. at 72.

Because the Court must submit the Parties' dispute to arbitration and the Defendants have requested a stay pending arbitration, see MTCA at 16, the Court will stay these proceedings pending the outcome of arbitration, see 9 U.S.C. § 3; Smith v. Spizzirri, 601 U.S. 472, 478 (2024); Early, 2026 WL 2224813, at *4.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS in part Defendants' [17] Motion to Dismiss and Compel Arbitration and STAYS this case pending further order of the Court.[3]

SO ORDERED.

CHRISTOPHER R. COOPER
United States District Judge

Date: October 20, 2026

[3] Defendants alternatively request that the Court dismiss the action. See MTCA at 5, 16. To the extent their motion seeks dismissal, the Court denies the request. See Smith, 601 U.S. at 478.